# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig | § | MDL 2179 |
| *Deepwater Horizon* | § | |
| in the Gulf of Mexico, | § | SECTION: J |
| on April 20, 2010, | § | |
| | § | JUDGE BARBIER |
| **This Document Relates To:** | § | |
| *Pleading Bundle B1* | § | MAG. JUDGE SHUSHAN |

_____

| | | |
|---|---|---|
| **IOANNIS KARAMPELAS-PLOUMARITIS** | § | CIVIL ACTION |
| **A/K/A IOANNIS KARAMPELAS-** | § | NO. _____ |
| **PLOUMARITIS,** | § | |
| **MERCHANT OF FRESH FROZEN** | § | SECTION J |
| **SEAFOOD A/K/A IOANNIS** | § | |
| **KARAMPELAS-PLOUMARITIS SEAFOOD** | § | JUDGE BARBIER |
| **TRADING** | § | |
| | § | MAG. JUDGE SHUSHAN |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | <u>COMPLAINT</u> |
| **BP AMERICA PRODUCTION COMPANY;** | § | |
| **BP EXPLORATION AND PRODUCTION,** | § | <u>JURY TRIAL DEMANDED</u> |
| **INC.; ANADARKO PETROLEUM** | § | |
| **CORPORATION; MOEX OFFSHORE 2007,** | § | |
| **LLC; MOEX USA CORPORATION;** | § | |
| **MITSUI OIL EXPLORATION CO., LTD.;** | § | |
| **TRANSOCEAN HOLDINGS LLC;** | § | |
| **TRITON ASSET LEASING GMBH;** | § | |
| **TRANSOCEAN DEEPWATER, INC.;** | § | |
| **TRANSOCEAN OFFSHORE DEEPWATER** | § | |
| **DRILLING, INC.; TRANSOCEAN LTD.;** | § | |
| **CAMERON INTERNATIONAL** | § | |
| **CORPORATION F/K/A COOPER-** | | |
| **CAMERON CORPORATION;** | | |
| **HALLIBURTON ENERGY SERVICES,** | | |
| **INC.; M-I, LLC, WEATHERFORD U.S. L.P.,** | | |
| | | |
| Defendants. | | |

_____

# I.
## INTRODUCTION

1.      The oil spill resulting from the explosion of the *Deepwater Horizon* has had ruinous consequences for Gulf Coast commercial fishers, shrimpers, supporting businesses, and businesses dependent on a vibrant Gulf coast economy. Plaintiff brings this action to redress the damages to and, the destruction of its livelihood.

2.      The *Deepwater Horizon* oil spill wrecked much of the Gulf Coast commercial seafood industry and related businesses, and it will be years, if ever, before it recovers. More than 200 million gallons of oil spewed into the Gulf, contaminating waters throughout the Gulf and destroying critical estuaries and shoreline habitats. BP chose to compound the impact of the spill on marine life by applying chemical dispersants to oil slicks on an unprecedented scale, resulting in a widespread toxic stew of oil and dispersants clouding Gulf waters and coating the Gulf floor. The spill destroyed habitat used by shrimp, oysters, crabs, and other fish central to the Gulf Coast fishing economy.

3.      The consequences, as it relates to this Plaintiff, have been catastrophic:  The shrimp population in the Gulf was decimated throughout impacted areas, and reproduction of shrimp has been dramatically damaged as stressed shrimp fail to produce eggs. Further, habitat critical to the development of juvenile shrimp was contaminated.  The *Deepwater Horizon* spill  impacted this Plaintiff specifically in that it was an exporter of Gulf Coast (head on) shrimp, for which there was a huge European and Greek market prior to the spill, which market the Plaintiff serviced.  Unfortunately, after the spill, there was no market for Gulf Coast shrimp in Europe and Greek.  Prior to the spill, the Plaintiff's only real competitor in

these markets were suppliers of West African Shrimp, but the Plaintiff had been able to sell Gulf Coast shrimp, which was far superior to its West African competitor, at a lower price, which was why the Plaintiff had been so profitable.

4.    This Plaintiff operated a vessel that was the first of its kind, as it sold boat to end user product, but its markets completely dried up and vanished, literally overnight, as all overseas buyers refused to buy Gulf Coast shrimp due to real and perceived contamination or the threat of contamination resulting from the *Deepwater Horizon* spill.

5.    In general, the business and market impacts of the *Deepwater Horizon* spill have been no less devastating for the commercial fishing industry. As the spill wiped out nearly an entire fishing year in 2010, and for this Plaintiff, each year thereafter, customers of Gulf seafood turned to alternative suppliers, including foreign imports and exporters.  It will take years for Gulf Coast shrimpers and businesses to win back their market share, and in the Plaintiff's case, it may never be able to re-establish its foreign market, given the negative perception that remains. In this regard, the spill tarnished the Gulf Coast seafood brand, destroying a premium, blue-chip reputation, which was coveted by the Plaintiff's foreign markets.

6.    The human and economic costs of the oil spill's impacts to Gulf seafood and related businesses have been catastrophic and astronomic, as many commercial fishers, including the Plaintiff, have lost their livelihoods.

7.    The cause of this destruction of the economic and social fabric of the Gulf seafood industry was more than an accident. The Defendants caused the spill and the destruction it has wrought with ongoing, deliberate, calculated decisions to favor profitable shortcuts over any regard for those whose livelihoods depend on the Gulf seafood industry.

3

8.  The federal government has found multiple transgressions of federal law by Defendants Halliburton, Transocean, and the BP entities that directly led to the *Deepwater Horizon* spill and its disastrous consequences.

9.  BP and its agent Gulf Coast Claims Facility ("GCCF") have broken promises and legal obligations to compensate fishers fully for the widespread damages suffered as a result of the *Deepwater Horizon* spill. Transocean and Halliburton have done nothing to accept responsibility for their role in the *Deepwater Horizon* disaster and, to the contrary, have attempted to evade all efforts to redress damages suffered by this and similar situated Plaintiffs, which damages are now in their seventh year.

10. This Plaintiff has invested extraordinary time, resources, and effort in presenting detailed and documented claims to BP (through GCCF as well as BP's other claims program and the Court-approved Economic and Property Damages settlement), Transocean, and Halliburton, which included setting forth specific claims for damages.  This effort included submission of multiple expert reports from a team of preeminent commercial fishing experts that quantified past damages and future risks confronting the commercial fishing industry. The Plaintiff has fulfilled any possible applicable requirement to present claims to BP, Transocean, and Halliburton, and, most recently, again by its letter dated December 23, 2015, which along with the attachments hereto, is attached hereto as **Exhibit B**, and is incorporated herein by reference as if set forth at length.

11. Halliburton and Transocean have refused to address any of Plaintiff's claims or even to provide a meaningful response. This Plaintiff was forced to opt out of BP's settlement due to its failure to redress their damages or have claims that are excluded from the settlement.

4

A true and correct copy of the Opt-out form is attached hereto as **Exhibit C**.

## THE PARTIES

**A.    Plaintiff**

12.    The Plaintiff, IOANNIS KARAMPELAS-PLOUMARITISa/k/a IOANNIS KARAMPELAS-PLOUMARITIS, MERCHANT OF FRESH FROZEN SEAFOOD, a/k/a IOANNIS KARAMPELAS-PLOUMARITIS SEAFOOD TRADING, a purchaser and exporter of, from the boat, frozen, head on shrimp to Greece and other overseas markets, harvested from the Gulf Coast, to include waters along the coasts of Texas and Louisiana.  Plaintiff's business was dependent on the Gulf Coast fishing economy, which business is now non-existent.

13.    The Plaintiff's principal is a resident of the Gulf states and whose livelihood depended on commercial shrimping in the Gulf, which is now non-existent due to the disaster.

14.    This Plaintiff actively and successfully harvested shrimp in and from affected Gulf waters at the time of the *Deepwater Horizon* spill.

15.    The Plaintiff's principal has been in the seafood business since 1986, and is the only real livelihood the Plaintiff's principal has ever known.

16.    The Plaintiff has made substantial investments in its business, to include purchasing boats, outfitting the same with special equipment, and training crews to support its business, and their fishing careers are entirely dependent on the Gulf of Mexico and its fisheries.

17.    The Plaintiff has presented its claims to BP (through GCCF, BP's other claims programs and/or the Court-approved Economic and Property Damages settlement, or otherwise), Transocean, and Halliburton. Claims presented to these entities include all information necessary to fulfill any applicable presentment requirement set forth by OPA and any other

applicable laws.

**B.    Defendants**

18.    BP Exploration & Production, Inc., is a Delaware corporation doing business in the State of Louisiana. BP E&P conducted the deepwater drilling, exploration, and production operations leading to the *Deepwater Horizon* spill. The United States Coast Guard has found BP Exploration to be a "Responsible Party" under the Oil Pollution Act of 1990, 33 U.S.C.§ 2714. The Court has personal jurisdiction over BP Exploration because BP Exploration is registered to do business in Louisiana and conducts business in Louisiana.

19.    BP Corporation North America, Inc., is an Indiana corporation with its principal place of business in Illinois. The Court has personal jurisdiction over BP Corporation North America, Inc., because it is licensed to do business in Louisiana and conducts business here.

20.    BP America, Inc., is a Delaware corporation with its principal place of business in Illinois. BP America, Inc., owns BP Exploration & Production, Inc. The Court has personal jurisdiction over BP America, Inc., because it is licensed to do business in Louisiana and conducts business here.

21.    BP America Production Company is a Delaware corporation with its principal place of business in Texas. BP America Production Company was the party to the drilling contract with Transocean Ltd., for the drilling of the Macondo Well by the *Deepwater Horizon* vessel. The Court has personal jurisdiction over BP America Production Company because it is licensed to do business in Louisiana and conducts business here.

22.    BP Products North America, Inc., is a Maryland corporation with its principal place of business in Texas. The court has personal jurisdiction over BP Products North America, Inc.,

because it conducts business in Louisiana.

23. BP p.l.c., is a foreign corporation with its principal place of business in London, England. The Court has personal jurisdiction over BP p.l.c., because it has conducted continuous and systematic activities here and because its activities related to the *Deepwater Horizon* spill made it reasonably foreseeable that it could be sued here.

24. Anadarko E&P Company, LP is a Delaware limited partnership with its principal place of business in Texas. The Court has personal jurisdiction over Anadarko E&P Company, LP because it conducts business in Louisiana.

25. Anadarko Petroleum Corporation in a Delaware corporation with its principal place of business in Texas. The Court has personal jurisdiction over Anadarko Petroleum Corporation because it conducts business in Louisiana.

26. MOEX Offshore 2007, LLC is a Delaware limited liability company with its principal place of business in Texas. The Court has personal jurisdiction over MOEX Offshore 2007, LLC because it conducts business in Louisiana.

27. MOEX USA Corporation is a Delaware corporation with its principal place of business in Texas. The Court has personal jurisdiction over MOEX USA Corporation because it conducts business in Louisiana.

28. Mitsui Oil Exploration Co., Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan. Mitsui Oil Exploration Co., Ltd. wholly owns and controls MOEX Offshore 2007, LLC and MOEX USA Corporation.

29. Transocean Holdings LLC is a Delaware limited liability company with its principal place of business in Texas. The Court has personal jurisdiction over Transocean Holdings LLC

because it conducts business in Louisiana.

30. Triton Asset Leasing GmbH is a Swiss Confederation limited liability company with its principal office in Zug, Switzerland. The Court has personal jurisdiction over Triton Asset Leasing GmbH because it has conducted continuous and systematic activities here and because its activities related to the *Deepwater Horizon* spill made it reasonably foreseeable that it could be sued here.

31. Transocean Deepwater, Inc., is a Delaware corporation with its principal place of business in Texas. The Court has personal jurisdiction over Transocean Deepwater, Inc., because it conducts business in Louisiana.

32. Transocean Offshore Deepwater Drilling, Inc., is a Delaware corporation with its principal place of business in Texas. The Court has personal jurisdiction over Transocean Offshore Deepwater Drilling, Inc., because it conducts business in Louisiana.

33. Transocean Ltd., is a Swiss Confederation Corporation. The Court has personal jurisdiction over Transocean Ltd., because it has conducted continuous and systematic activities here and because its activities related to the *Deepwater Horizon* spill made it reasonably foreseeable that it could be sued here.

34. Halliburton Energy Services, Inc., is a Delaware corporation with its principal place of business in Texas. The Court has personal jurisdiction over Halliburton Energy Services, Inc. because it conducts business in Louisiana.

## JURISDICTION AND VENUE

35. The Oil Pollution Act ("OPA"), 33 U.S.C. § 2717(b), grants United States district courts exclusive original jurisdiction over all claims and controversies arising under OPA. *See also*

33 U.S.C. § 2717(f)(2); 28 U.S.C. § 2201 (a). Accordingly, this Court has subject matter jurisdiction over this action pursuant to OPA.

36. Article III, Section 2 of the United States Constitution grants the Court jurisdiction over "all claims of admiralty and maritime jurisdiction." Accordingly, this Court has subject matter jurisdiction over this action pursuant to the United States Constitution.

37. The Court has supplemental jurisdiction over all of Plaintiff's claims, including common law and state law claims, pursuant to 28 U.S.C. § 1367(a) because these claims are so related to other claims in the action within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

38. Venue is proper in the Eastern District of Louisiana under 28 U.S.C. § 1391(a)(2), 33 U.S.C. § 2717(b), and La. R.S. 30:2025 because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District and substantial damage occurred here.

## FACTUAL BACKGROUND

### A.     The *Deepwater Horizon* Spill, In General

39. The *Deepwater Horizon* spill was unprecedented in size, duration, and scope. After the Deepwater Horizon rig exploded on April 20, 2010, oil spewed unchecked for 12 weeks. This resulted in the release of more than 200 million gallons of oil into the Gulf. The *Deepwater Horizon* spill is the largest oil spill in the history of North America, dwarfing the catastrophic 1989 *Exxon Valdez* oil spill, and is one of the world's worst environmental catastrophes.

40. The Macondo 252 Well site was leased to BP by the (former) United States' Mineral

Management Services[1] on June 1, 2008. BP's "exploration plan" for the Macondo Well was approved on April 6, 2009, and BP received drilling permits for the Macondo Well shortly thereafter.

41.     Upon receiving its approved drilling permits, BP entered into an Operating Agreement with Andarko, Andarko E&P, and MOEX Offshore, wherein all parties were joint leaseholders of the Macondo 252 well site. BP was the operating leaseholder.

42.     The *Deepwater Horizon* was a $560,000,000 drilling rig owned by Transocean, and it had been in service since 2001. BP paid Transocean $500,000 per day to lease the *Deepwater Horizon* rig and planned its drilling work to take place over 51 days at an approximate cost of $96,000,000.

43.     Halliburton Energy Services was responsible for cementing operations for the Macondo 252 well and conducted operations aboard the *Deepwater Horizon* rig and provided offshore support for those operations. Halliburton was engaged in cementing operations to design, cement, and to seal the bottom of the Macondo Well at the time of the blowout.

44.     At the time of the *Deepwater Horizon* explosion, BP was incurring costs of over $1,000,000 per day to drill the well and was months behind schedule, causing the project to be over budget and increasing pressure on the *Deepwater Horizon* staff to complete the drilling as quickly as possible. Ultimately, the *Deepwater Horizon* spill was caused by BP's and the other Defendants' decisions to cut corners, ignore safety protocols, and violate regulations in order to expedite the drilling process.

_____

[1] It has since been reorganized as the Bureau of Ocean Energy Management, Regulation and Enforcement, as of June 18, 2010.

45.    For example, BP had a choice between two types of drill casings: a "liner/tieback" which had

four barriers against blowouts, and a "long string" which only had two barriers as protection

against blowouts. Even though BP's original plan called for use of the "liner/tieback" drill

casing and BP's contractors recommended the use of the "liner/tieback" drill casing, BP

elected to use the "long strong" casing, trading off protections against a blowout and the

resulting risks to life, safety, and environmental damage in order to save time and reduce

costs on the late and over-budget project.

46.    Additionally, BP also used too few stabilizers during the drilling of the well, and it failed to

properly seal the "float collar", a device which prevents hydrocarbons from leaking into the

well. These failures were borne of a reckless and cavalier approach to safety throughout BP

management and the staff responsible for *Deepwater Horizon* drilling operations.

47.    The Defendants' systematic disregard of safety protocols, drilling regulations, and sound

judgment was widespread. Illustrative examples include, but are not limited to:

   a.    BP's failure to circulate drilling mud through the entire well prior to cementing to
         ensure proper and complete cementing of the well;
   b.    Halliburton's recommendation of use of a "foamed cement" mixture to seal the
         Macondo well, an improper decision that led to instability and weakness in the
         cement and prevented the cement from sealing the well; and
   c.    BP failed blow-out prevented system that did not sever the drill pipe and seal the well
         prior to the explosion.

48.    Defendants made a series of reckless and intentional decisions that led to the explosion and

subsequent spill, including, *inter alia*:

   a.    choosing and implementing a less expensive and less time-consuming long string
         well design, which had few barriers against a gas blowout, instead of a safer
         liner/tieback design which would have provided additional barriers to gas blowout,
         despite its knowledge that the liner/tieback design was a safer option;
   b.    using pipe material that it knew might collapse under high pressure;

11

    c.      using too few centralizers to ensure that the casing was centered into the wellbore;

    d.      failing to implement a full "bottoms-up" circulation of mud between the running of the casing and the beginning of the cement job in violation of industry standards;

    e.      failing to require comprehensive lab testing to ensure the density of the cement, and failing to heed the ominous results of negative pressure testing which indicated that the cement job was defective;

    f.      cancelling the cement bond log test that would have determined the integrity of the cement job;

    g.      failing to deploy the casing hanger lockdown sleeve to prevent the wellhead seal from being blown out by pressure from below;

    h.      using an abnormally large quantity of mixed and untested spacer fluid;

    i.      failing to train drilling vessel workers and/or onshore employees, and to hire personnel qualified in risk assessment and management of complex systems like that found on Deepwater Horizon;

    j.      requiring simultaneous operations in an effort to expedite the project, making it difficult for workers to track fluid volumes in the wellbore; and

    k.      causing property damage to the vessels involved in the VoO program, and failing to properly administer and provide payment for work, time, and/or property damage to those entities and workers participating in the VoO program.

49.    As a result of BP's numerous safety failures, hydrocarbons leaked into and infiltrated the Macondo Well on the evening of April 20, 2010. As the hydrocarbons pushed their way up the well and out of the pipes linked to the *Deepwater Horizon*, the *Deepwater Horizon* became enveloped in a dangerous cloud of natural gas, which was then ignited, causing the explosion of the *Deepwater Horizon* and subsequent disaster.

50.    That is merely the technical explanation of the physical forces that led to the explosion of the *Deepwater Horizon*. More fundamentally, the explosion and spill occurred because the Defendants repeatedly and systematically chose to violate safety rules and regulations in order to increase profits and expedite drilling. As a result, the *Deepwater Horizon* explosion was ultimately caused by Defendants' systematic and reckless disregard and violation of federal regulations, laws, and safety protocols.

51.    BP, Transocean, and Halliburton have been issued numerous citations by the United States

government for safety, management, as other failures related to the *Deepwater Horizon* explosion and oil spill, *e.g.*, BP was issued citations on December 7, 2011, related to its decisions to continue drilling even after BP had evidence that the risks of drilling exceeded government mandated regulations.

52.    The federal government conducted an extensive investigation of the events leading to the Deepwater Horizon spill. The Coast Guard report documenting the findings of that investigation found that the Defendants violated numerous federal laws, and those violations contributed to the catastrophe. Reports documenting Defendants violation of laws include: "On Scene Coordinator Report Deepwater Horizon Oil Spill" submitted to the National Response Team, September 2011; "Joint Investigation Team Report" issued by the Coast Guard and Bureau of Ocean Energy Management, Regulation & Enforcement, September 9, 2011; "Report Regarding the Causes of the April 20, 2010, Macondo Well Blowout" issued by the Bureau of Ocean Energy Management, Regulation and Enforcement, September 14, 2011; and regulatory violations issued by the Bureau of Safety and Environmental Enforcement, October and December 2011.

**B.    Damage to the Gulf Shrimp Fishery**

53.    The Gulf shrimp industry is an economic engine for Gulf states worth more than $1 billion annually to the fishers, shrimp docks, processors, and retailers who rely on Gulf shrimp for their livelihoods.

54.    The *Deepwater Horizon* spill has caused profound and lasting damage to the Gulf shrimp industry. Oil and the toxic dispersants BP used in response to the spill are deadly to shrimp. The spill and BP's response contaminated Gulf waters and the Gulf bottom where adult

shrimp borrow and the shorelines, estuaries, and bayous where juvenile shrimp grow. Moreover, shrimp feed on organisms that are themselves vulnerable to death and toxic bioaccumulation from oiled waters. For all of these reasons, shrimp are particularly vulnerable to effects of the *Deepwater Horizon* spill.

55.   Shrimp have faced and will continue to face severe biological impacts from the spill. The spill and BP's response caused significant direct mortality of shrimp populations. The presence of toxins in their habitat, bioaccumulation, and loss of food sources render shrimp susceptible to disease and reduced reproduction.

56.   The combined effects have caused and will continue to cause dramatic declines in shrimp populations and smaller shrimp from the Florida panhandle to eastern Texas.

57.   The *Deepwater Horizon* spill has also caused and will continue to cause long-term business and marketplace impacts. The Gulf shrimp industry has worked for years to promote Gulf shrimp as a premium brand. The spill has destroyed the Gulf brand and has caused buyers, restaurants, and the public to fear Gulf shrimp.

58.   Purchasers of Gulf shrimp have replaced it with imported and farm-raised shrimp. By the end of 2010, the demand for Gulf shrimp decline precipitously and market share for Gulf shrimp had been decimated. It will take years for Gulf shrimp to reclaim its market share.

59.   The *Deepwater Horizon* spill has caused prices for Gulf shrimp to plummet. Having lost customers to alternative sources of shrimp and confronting minimal demand for their shrimp, sellers of Gulf shrimp have been forced to lower prices to rock-bottom levels that do not support a profit.

60.   The combined biological and market impacts caused by the *Deepwater Horizon* spill have

been catastrophic for the shrimp industry. In early 2011, the few surviving brown shrimp that were caught brought prices as low as 25 cents per pound that made it impossible to shrimp profitable. And shrimpers found a lack of small shrimp and few shrimp with eggs, indicating that biological impacts will continue for years to come.

61.   Throughout the Gulf, shrimp fishers experienced the worst white shrimp season in years.

62.   Like 2010, 2011 was a complete loss of the Gulf shrimp industry and, for this Plaintiff, each year thereafter. Both the market and biological impacts are certain to continue for years.

63.   For shrimp fishers and related businesses, the impact has been catastrophic. Without fishing profits and facing profound future uncertainty, many shrimp fishers cannot afford to finance and maintain their boats, which also occurred to Plaintiff. The *Deepwater Horizon* spill has and will continue to destroy the livelihoods of many shrimp fishers.

   **C.   Ioannis Karampelas-Ploumaritis a/k/a Ioannis Karampelas-Ploumaritis, Merchant of Fresh Frozen Seafood, a/k/a Ioannis Karampelas-Ploumaritis Seafood Trading**

64.   Ioannis Karampelas Ploumaritis, the main principal of the Plaintiff, ("Karampelas"), has been in the seafood business since 1986, most of which time was spent in harvesting as a fishing trawler owner, selling, marketing, understanding, and developing relationships in the Greek and European whole shrimp, lobster, and seafood markets, and particularly developing a boat to end-user product.  Further, as a practical matter, because of the sheer uniqueness of the business he created as it relates to the Plaintiff's claim, made the basis of this case, and as more fully described herein below, as a result of the BP oil spill, that business ceased to exist on the day the spill occurred, leaving Mr. Ploumaritis without a business and left to mitigate his losses, to the extent possible, here in Texas, a market in which he did not have

any experience or history.  More specifically, Karampelas initially funded and spearheaded the opening and operation of a U.S. Gulf Coast shrimping business, which operated under two Texas Corporations called Porto Castelo, Inc., ("Porto Castelo"), and Porto Aegean, Inc., ("Porto Aegean").  Porto Castelo and Porto Aegean purchased and owned one shrimping vessel each, the Miss Eva and the Nicolas, respectively, to conduct such business, which vessels were specifically outfitted to harvest, freeze and package, on board, HEAD-ON shrimp from the Gulf of Mexico for immediate export to Europe and Greece, in particular through Odyssey Seafood.  Unlike the vast majority of the U.S. market, the European market and Greece, in particular, prefer HEAD-ON shrimp versus, what we, here in the states, refer to as tails only. Porto Castelo and Porto Aegean's method of packing and boxing the shrimp on board under European Union regulations was unique in the industry.  In fact, Porto Castelo and Porto Aegean were the first entities/operations/businesses in United States shrimp fishing history to develop and establish such a process and export business.  To accomplish this task, supervision of a highly skilled quality expert with expertise in European quality standards and regulations was hired from Europe.  Further, Porto Castelo and Porto Aegean made modifications to the Miss Eva and the Nicolas to meet European Union regulations.

65.    The businesses technically began in August 2004, at or about the time the vessels were purchased.  It took more or less than a year to equip the vessels to meet the USA Coast Guard navigation and shrimp fishing regulations.  Thereafter, both Porto Castelo and Porto Aegean applied for the EU permit to process and box HEAD-ON shrimp on the Miss Eva and the Nicolas.  It was not until the year  2007 that Porto Castelo and Porto Aegean were able to

16

make the specific modifications to the vessels and train the crews in this unique process, all at great expense, to include but not limited to hiring an expert from Europe, as set forth above, to assist in training the crews and outfitting the boats. Given the special treatment, knowledge, expertise, and experience it took to achieve the high quality sea frozen HEAD-ON finished product ready for export straight from the vessels, the educational process and hands on training required roughly three years to complete. The rough estimate of the process time from start to finish was 3-4 years. The particular allure of such a process and the motivation for making the required investment lies in the product's mark-up. For example, in Europe, the price of sea frozen HEAD-ON shrimp is at least 1.5 euros per pound higher than the land factory frozen product found here, which increase translated into profits from the end user in Greece and Europe all the way down the chain through Odyssey Seafood and Karampelas to Porto Castelo and Porto Aegean. By way of a more vivid comparison of the processes distinction, a regular shrimp boat in the Gulf of Mexico puts the harvested shrimp in onion bags which are transported to the factories. The factories then process and pack the shrimp, of course, tails only and preservatives added, and then sell the shrimp in the U.S., domestic market only, all of which impacts the product's freshness and value.

66. From a purely financial perspective, in excess of $3,000,000.00 was invested to establish this unique export business from bottom to top for shrimp and lobster from the Gulf of Mexico.

67. Not surprisingly, before the BP oil spill, the business was expanding quite rapidly and was immediately profitable. For example, from the year 2007 (103,380 lbs.), to 2008, (139,920 lbs.) sales significantly increased, but from 2008 to 2009, (335,500 lbs.), they more than doubled. The future looked no less bright because the exported HEAD-ON shrimp, from the

Gulf of Mexico, was recognized in the European markets and by European distributors as a superior product, backed by a FDA European Union regulation's permit.  By contrast, after the BP oil spill occurred, Gulf of Mexico shrimp were immediately tainted and over night became unmarketable. European distributors and customers emptied all shelves and either destroyed or returned all unsold product and refused to purchase any more product because of fears of short and long term contamination resulting from the BP oil spill.  Also, not surprisingly, all efforts by Odyssey and Karampelas to continue or restart the export business of shrimp from the Gulf of Mexico to the European market failed due to its European distributors' adamancy about not buying product from the Gulf of Mexico due to such fears of contamination.  By way of specific example, in 2011, a container of shrimp product was shipped by Odyssey Seafood to a European distributor.  The container was returned, out of hand.  Further, before the spill and, more particularly, on April 2, 2010, Odyssey Seafood and Karampelas (Buyer, broker, and European distributor for Odyssey Seafood) sent samples of the Gulf Coast shrimp (head on) to an Australian customer.  The product was favorably received.  Accordingly, Odyssey Seafood and Karampelas were in the process of negotiating the details of an agreement to begin exporting shrimp from the Gulf of Mexico to Australia when the oil spill occurred.  When the news  of the extent of the spill reached Australia in earnest, the Australian customer informed Odyssey Seafood and Karampelas that it was terminating all discussions and negotiations and that it would not purchase any shrimp from the Gulf of Mexico because of the fear of contamination and any real contamination that occurred in the short or long term. Simply put, although Odyssey Seafood and Karampelas' foot hold was first established in Greece, it's foot print had taken hold in all of Europe, and

18

the losses have been calculated by Odyssey Seafood and I. Karampelas are really only those from sales in Greece alone.

68.  As a result of the European and Australian reaction to the oil spill, both Odyssey Seafood and I. Karampelas were forced to cease operating this unique and rapidly expanding business. Odyssey Seafood and I. Karampelas' export business is dead, as its market was eliminated by the BP oil spill, and there is no hope of restarting the same, at least for the foreseeable future.

69.  Invariably, while it may well be obvious, the business model functioned fairly simply.  Porto Castelo and Porto Aegean harvested and processed the HEAD-ON shrimp for shipping to Europe. They sold their harvests, exclusively and  at a profit to Odyssey Seafood, a Texas corporation, which arranged for the shipment and sale of the shrimp to I. Karampelas, also at a profit, who had local contacts in Europe and Greece particularly, to whom it sold the HEAD-ON shrimp at a profit, who then delivered the same to the end user.   Each level was necessary and the end market supported the profit generated at each step, which market was far from saturated, thus ensuring room for significant future growth.  It would also serve to point out that I. Karampelas' local contacts were far from *ad hoc* and casual relationships, but were supported by written contracts with specific quotas for product in an ever increasing market.  Simply put, the losses identify the loss of gross profit by Odyssey Seafood  by way of its transactions with I. Karampelas and its corresponding transactions with its local European contacts, using only its existing harvesting capacity, its historical sales and expenses and established growth, to determine future profit and market growth to the model's end.

19

# LEGAL BACKGROUND

### A.     The Oil Pollution Act of 1990

70.     The Oil Pollution Act, 33 U.S.C. § 2701, *et seq.* ("OPA"), imposes liability upon a "responsible party for a ... vessel or a facility from which oil is discharged...into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs.

71.     BP and Transocean are strictly liable pursuant to Section 2702 of the OPA for all the damages resulting from the Spill because the United States Coast Guard has named BP as the responsible party for the sub-surface release of oil and Transocean as the responsible party for the release of diesel on the surface.

72.     Responsible parties under OPA Sections 2701(16) and (32) include lessees of the well and its surrounding areas. Defendants Anadarko, Anadarko E&P, and MOEX Offshore held a leasehold interest in a lease granted by the MMS for Block 252, Mississippi Canyon (the "Macondo lease"), an oil lease on lands beneath navigable waters at the time of the Spill. As such, they are strictly liable pursuant to Section 2702 of the OPA for all the damages resulting from the Spill841.

73.     Section 2704(c) *et seq.* Of the OPA prevents parties from limiting their liability under Section 2704(a) for spills caused by their gross negligence, willful misconduct, or violation of applicable safety, construction or operating regulations. Defendants BP and Transocean are not entitled to limit their liability under Section 2704(a) of the OPA because the Spill was proximately caused by their gross negligence, willful misconduct, or violation of applicable

safety, construction or operating regulations.

74.   In its "Statement of BP Exploration & Production Inc. Re Applicability of Limitation of Liability Under Oil Pollution Act of 1990," filed on October 19, 2010, BP waived the statutory limitation on liability under the OPA.

75.   Section 2702(b)(2)(B) of OPA provides for recovery of damages to real or personal property, including: "[D]amages for injury to, or economic losses resulting from destruction of, real or personal property, which shall be recoverable by a claimant who owns or leases that property, including the diminution in the value of their property."

76.   Section 2702(b)(2)© of OPA provides for recovery for: "[D]amages for loss of subsistence use of natural resources, which shall be recoverable by any claimant who so uses natural resources which have been injured, destroyed, or lost, without regard to the ownership or management of the resources."

77.   Section 2702(b)(2)(E) of OPA provides for: "[D]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss or real property, personal property, or natural resources, which shall be recoverable by any claimant."

78.   Plaintiffs have satisfied Sections 2713(a) and (b) of OPA by presenting their claims to BP, Transocean, and Halliburton for resolution.

### B.   Federal Maritime Law

79.   The Jones Act, 46 U.S.C. §688, *et seq.,* codified negligence as a cause of action under federal maritime law.   Under federal maritime law, the standard of negligence is "reasonable care under the circumstances" or the "duty of ordinary care."   Those who drill for, collect, or transport oil in federal waters owe a duty to conduct these operations with reasonable and

ordinary care.

80. Punitive damages are available to commercial fishers under federal maritime law, and this Court has ruled that punitive damages are available in this action for commercial fishers. The gross negligence of BP, Transocean, and Halliburton justifies an aware of punitive damages,  Plaintiffs seek their proportionate share of punitive damages based on their extensive compensatory losses.

**C.      Louisiana Law Governing Oyster Lease Damages**

81. Louisiana Rev. Stat. Section 56:422 allows Louisiana residents, firms and corporations to "catch and take, can pack, shuck, or deal in or transport oysters from the waters of this state," and to "lease bedding grounds for the cultivation and propagation of oysters for any of those purposes within any waters within the territorial jurisdiction of the state, upon the terms and conditions and subject to the restrictions and regulations herein set forth, or under the authority which may be imposed by the commission."

82. Louisiana Rev. Stat. Section 56:422 further provides:  "Any person properly licensed to operate in the oyster industry in this state may employ such labor, resident or nonresident, as required, and may employ such vessels and their crews, resident or nonresident, as required, upon the vessels being properly licensed."

83. Louisiana Rev. Stat. Section 56:428 provides that oyster leases "continue for a period of fifteen years," and leaseholders have a "first right of renewal of their leases" in perpetuity.

84. Louisiana Rev. Stat. Section 56:423 provides that oyster lessees "shall enjoy the exclusive use of the water bottoms leased and of all oysters and cultch grown or placed thereon." subject only to the narrow restrictions stipulated therein.

22

85.  Louisiana Rev. Stat. Section 56:423 further provides: "A lessee of oyster beds or grounds who has obtained, recorded, and marked his lease in compliance with the law shall have the right to maintain an action for damages against any person, partnership, corporation, or other entity causing wrongful or negligent injury or damage to the beds or grounds under lease to such lessee."

## COUNT I
## VIOLATION OF OPA

86.  Plaintiff incorporates by reference all preceding paragraphs as though set forth fully herein.

87.  BP and Transocean are responsible parties under OPA.  The Coast Guard has named BP as the responsible party for the downhole release of oil and Transocean as the responsible party for the release of diesel on the surface.  As holders of lease interests in the Macondo lease at the time of the  spill, Anadarko, Anadarko E&P, and MOEX Offshore are responsible parties under OPA.  MOECO is a "responsible party" under OPA due to its ownership, domination, and control of the business and operations of MOEX Offshore and MOEX USA.

88.  As responsible parties, said Defendants are strictly liable for all damages caused by the Spill.

89.  Defendants BP and Transocean cannot limit their liability under OPA because their grossly negligent and willful misconduct caused the spill, including violations of safety, construction, and operating regulations.  BP has waived statutory limitation on liability under OPA.

90.  The spill has damaged natural resources and has devastated Plaintiff, who relies on commercial fishing and/or a vibrant Gulf economy for income.  The spill further caused damage to Plaintiff's real and personal property and has severely undermined the Plaintiff's

past, present, and future earning capacity.  Plaintiff is entitled to damages from said

Defendants under OPA in an amount to be determined at trial.

## COUNT II
## FEDERAL MARITIME LAW:  NEGLIGENCE

91.    Plaintiff incorporates by reference all preceding paragraphs as though set forth fully herein.

92.    Defendants BP, Transocean, and Halliburton participated in *Deepwater Horizon* drilling

operations and breached duties to conduct drilling operations with ordinary and reasonable

care.  Said Defendants knew the risks of deep water drilling operations, yet failed to take

reasonable care to avoid the catastrophic spill and ongoing damages caused by the explosion

and spill.

93.    Defendants Transocean, BP, and Halliburton breached duties to exercise reasonable care in

the design, creation, management, and control of the well.

94.    As the owner and manager of the *Deepwater Horizon,* Transocean owed duties of care to

Plaintiff to maintain and operate the rig with reasonable and ordinary care.  Transocean

breached its duties to by failing to maintain and operate the *Deepwater Horizon* and its safety

equipment properly.   The *Deepwater Horizon's* Blowout Preventer, sensors, valves,

detection, emergency, and related equipment failed due to Transocean's breach of their duties

of care.  Moreover, Transocean's drillers were responsible for monitoring the Macondo well,

maintaining well control throughout drilling operations, and taking corrective or responsive

actions to limit the severity of any well control event.  Transocean breached its duties to

execute these critical responsibilities with reasonable and ordinary care.

95.    Defendant Halliburton breached duties to Plaintiff to exercise ordinary and reasonable care

in designing and testing cement, cementing, and monitoring the *Deepwater Horizon* well. Halliburton violated its own and industry protocols for cementing the well and took numerous shortcuts that compromised safety in order to save time and money.

96. Defendants, BP, Transocean, and Halliburton breached their duties to exercise reasonable care to ensure that any discharged oil would be contained in an expeditious manner. Likewise, Defendants breached their duty to exercise reasonable care to ensure that adequate safeguards, protocols, procedures and resources available and used to prevent or mitigate the spill.

97. The existence and breach of these legal duties are established under the general maritime law and state law.

98. Said Defendants  violated numerous state and federal laws and permits governing drilling operations, drilling rig, and drilling equipment.  These laws and permits create statutory standards that are intended to protect and benefit Plaintiff.  The violations of these statutory standards constitute negligence per se under Louisiana, Texas, Mississippi, Alabama, Florida, and the general maritime law.

99. BP exacerbated damage to fisheries by failing to exercise ordinary and reasonable care to mitigate the oil spill and by using chemical dispersants to submerge oil in critical marine habitats.

100. Said Defendants' negligence caused severe and foreseeable damages to the natural resources and commercial fisheries on which Plaintiff relies for income and their livelihoods.  As a result of said Defendants' negligent actions, Plaintiff has suffered and will continue to suffer diminished income, loss businesses, interruptions to their businesses, and related economic

losses.  Plaintiff further suffered damages to and lost value of personal property directly caused by said Defendants' negligence.

101.   The *Deepwater Horizon* spill was caused by the said Defendants' joint and concurrent negligence, which renders them jointly and severally liable to Plaintiff.

## COUNT III
## FEDERAL MARITIME LAW: GROSS NEGLIGENCE AND WILLFUL MISCONDUCT

102.   Plaintiff incorporates by reference all preceding paragraphs as though set forth fully herein.

103.   Defendants BP, Transocean, and Halliburton participated in Deepwater Horizon drilling operations and owed duties to conduct theses operations with ordinary and reasonable care. Their breach of those duties was reckless, intentional, willful, wanton, and grossly negligent.

104.   BP intentionally violated federal regulations and operational protocols when drilling the well in order to save money at the expense of safety.  Its reckless decision to prioritize cost cutting over safety directly contributed to the *Deepwater Horizon* disaster and its severity.  BP conducted drilling operations with egregious and wanton disregard of safety.  It recklessly disregarded data and information clearly demonstrating problems with control of the Macondo well.  Its decision to ignore those warning signs was intentional and grossly departed from all relevant standards of care.  BP intentionally and recklessly used substandard and insufficient materials when drilling, sealing and cementing the well. Defendants BP and Transocean made reckless and intentional decisions to disable and disregard alarm systems and warning signs that should have prevented the explosion of the *Deepwater Horizon*.

105.   Transocean was grossly negligent in its care and maintenance of the *Deepwater Horizon*.

Transocean intentionally disregarded safe operations by failing to conduct scheduled maintenance on the rig.  Knowing that operation of the Blowout Preventer was absolutely essential to the preventing an uncontrolled well given a well control event, Transocean's intentional decisions to prioritize revenue over safety and maintenance caused the Blowout Preventer to fail.  Transocean's drillers were responsible for maintaining well control, conducting drilling operations, monitoring critical data, and shutting in the well during a well control event.  Transocean grossly deviated from fulfilling these duties with reasonable care and recklessly ignored catastrophic risks.

106.   Halliburton was responsible for cementing the Macondo well.  Halliburton's cement should have established a critical barrier preventing the blowout.  Halliburton knowingly and recklessly violated its own and industry protocol for the design of the cement.  Halliburton's conduct after the spill manifested its grossly negligent conduct by concealing testing data and destroying, degrading, or hiding evidence.

107.   BP recklessly and intentionally exacerbated damage to commercial fisheries by using chemical dispersants to sink oil onto the habitat of shrimp, oyster, crabs, and finfish.

108.   Catastrophic damage to commercial fisheries and the Gulf economy was a foreseeable consequence of all of theses Defendants' intentional, reckless, and grossly negligent misconduct, and said Defendants knew or should have know that their misconduct would cause extraordinary damages to the natural resources of the Gulf and those who rely on commercial fisheries for their livelihoods.

109.   Plaintiff is entitled to compensatory damages caused by BP's, Transocean's, and Halliburton's intentional, reckless, and grossly negligent misconduct.  Plaintiff is entitled to

punitive damages in an amount sufficient to punish each of said Defendants for their recklessness and grossly negligent misconduct and to deter future misconduct.

## COUNT IV
## FRAUDULENT CONCEALMENT

110.   Plaintiff incorporates by reference all preceding paragraphs as though set forth fully herein.

111.   Defendants knowingly and fraudulently concealed facts about the severity of the Deepwater Horizon spill, BP's response to the spill, potential damages arising from a blowout, and ongoing impacts caused by the spill.

112.   Halliburton fraudulently concealed evidence after the spill to evade responsibility for its role in the disaster.

113.   Defendants' intentional and fraudulent concealment of facts pertaining to the likelihood of, impacts from, and magnitude of the spill directly and proximately caused damages to the Plaintiff.

114.   Defendants' fraudulent concealment of the scope and extent of the damages caused by the Deepwater Horizon spill resulted in GCCF failing to compensate Plaintiff for the damages.

## COUNT V
## PUNITIVE DAMAGES

115.   Plaintiff is entitled to an award of punitive damages as a result of Defendants' intentional and fraudulent misconduct.

116.   Plaintiff is entitled to punitive damages under federal maritime law.  See Order and Reasons [As to Motions to Dismiss B1 Master Complaint], Docket No. 3830, August 28, 2011.  Most Plaintiffs named herein are fishers eligible for punitive damages.  The Plaintiff reserves its right to receive punitive damages upon showing that they suffered from direct oiling of their

property or other basis sufficient under law to establish entitlement to punitive damages.

117.   BP's, Transocean's, and Halliburton's grossly negligent and reckless misconduct justifies an award of punitive damages against each of them to Plaintiff in an amount to be determined at trial.

## COUNT VI
## STATE STATUTORY CLAIMS [2]

118.   Plaintiff incorporates by reference all preceding paragraphs as though set forth fully herein.

119.   Defendants breached their statutory duty to Plaintiff by causing crude oil to be discharged into the Gulf of Mexico and allowing dispersants to migrate into Texas's marine and coastal areas in violation of The Texas Oil Spill Prevention and Response Act, Tex. Nat. Res. Code Ch. 40 §276.011.

120.   Defendants breached their statutory duty to Plaintiff by causing crude oil to be discharged into the Gulf of Mexico and allowing dispersants to migrate into Louisiana's marine and coastal areas in violation of The Louisiana Oil Spill Prevention and Response Act, La R.S. 30:2451, *et seq.*; La Admin. Code 43:161.

121.   Defendants breached their statutory duty to Plaintiff by causing crude oil and dispersants to contaminate oyster beds, reefs, and Gulf bottom leased by Plaintiff.  *See* LA Rev. Stat. 56.423.

122.   Defendants breached their statutory duty to Plaintiff by causing crude oil to be discharged into the Gulf of Mexico and allowing dispersants to migrate into Mississippi's marine and coastal areas in violation of The Mississippi Air and Water Pollution Control Law, Miss.

---

[2]  As to state law claims the Court has previously dismissed, Plaintiff alleges claims to preserve its rights on appeal.

Code Ann. §49-17-1, *et seq.*

123. Defendants breached their statutory duty to Plaintiff by causing crude oil to be discharged into the Gulf of Mexico and allowing dispersants to migrate into Alabama's marine and coastal areas in violation of Alabama Code §9-2-1, *et seq.*; and §9-4-1, *et seq*.

124. Defendants breached their statutory duty to Plaintiff by causing crude oil to be discharged into the Gulf of Mexico and allowing dispersants to migrate into Florida's marine and coastal areas in violation of The Florida Pollutant Discharge Prevention and Control Act, Fla. Stat. §376.011, *et seq*.

125. Defendant's violations of these statutes has caused Plaintiff to suffer damages in an amount to be determined at trial.

126. To date, The Plaintiff's claim totals $22,856,523.32. A true and correct copy of the summary calculation of such amount is attached hereto as **Exhibit D**.  In arriving at such amount, several assumptions and/or facts were made and/or considered, respectively.  They are as follows:

    a.    Actual sales volume doubled from 2008 to 2009, which made sense in that by that point the market had established itself and it recognized the quality and availability of the product;

    b.    The boats maximum production was 350,000 lbs., per year in 2011, which amount includes down time, repairs, weather, harvest period, delays, *etc.*;

    c.    The availability of purchasing 600,000 lbs., from third parties, as it was apparent that the two boats were not sufficient to supply the difference between the market demands and the two boats' maximum annual production;

    d.    Sales prices are based on but lower than European competitor's prices, which competitor's prices are based on product that is inferior in quality;

    e.    A 30% annual increase in purchased shrimp, which is reasonable given that there is conservatively a 25 million lb., market for HEAD-ON shrimp in Greece alone, and with the higher quality of Gulf of Mexico shrimp at a lower price, the 30% increase was not only achievable but conservative as well; and

    f.    2016 and 2017 prices and costs are the same as 2015.

WHEREFORE, the Plaintiff, IOANNIS KARAMPELAS-PLOUMARITIS a/k/a IOANNIS KARAMPELAS-PLOUMARITIS, MERCHANT OF FRESH FROZEN SEAFOOD, a/k/a IOANNIS KARAMPELAS-PLOUMARITIS SEAFOOD TRADING,  prays this Honorable Court issue a judgment in favor of the Plaintiff against Defendants for:

(1)     Compensatory damages;

(2)     Punitive and exemplary damages;

(3)     Unpaid property damages;

(4)     Pre-judgment and post-judgment interest;

(5)     Attorneys' fees and all costs and expenses associated with documenting, preparing, and proving entitlement to and amount of damages; and

(6)     All such other relief as they may show themselves justly entitled to receive.

Plaintiff hereby demands a jury trial.

Respectfully submitted,

THE KRELLER LAW FIRM

By: /s/ Stephen Skelly Kreller
    Stephen Skelly Kreller (LA 28440)
    757 St. Charles Avenue, Suite 301
    New Orleans, Louisiana 70130
    (504) 484-3488   Telephone
    (504) 294-6091   Facsimile
    ssk@krellerlaw.com

DABNEY & PAPPAS

    Gus E. Pappas (admitted PHV)
    1776 Yorktown, Suite 425
    Houston, Texas 77056
    (713) 621-2678   Telephone
    (713) 621-0074   Facsimile
    gus@dabneypappas.com

FAEGRE BAKER DANIELS LLP

    William L. Roberts (admitted PHV)
    Craig S. Coleman (admitted PHV)
    Jonathan W. Dettman (admitted PHV)
    2200 Wells Fargo Center
    90 South Seventh Street
    Minneapolis, MN 55402
    (612) 766-7000   Telephone
    (612) 766-1600   Facsimile

## <u>CERTIFICATE OF SERVICE</u>

       I, Gus E. Pappas, counsel for the Plaintiff, do hereby certify that a true and correct copy of the foregoing Complaint was served on the following through the United States Mail on this the 2nd day of May, 2016:

Counsel for BP
Attn: J. Andrew Langan
Kirkland & Ellis LLP
300 North LaSalle St. Suite 2400
Chicago, IL 60654

MDL 2179 Plaintiffs' Steering Committee
Attn: Steve Herman or Jim Roy
The Exchange Centre, Suite 2000
935 Gravier Street
New Orleans, LA 70112

                                         /s/ Gus E. Pappas
                                         Gus E. Pappas